# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Kevin Rodewald,                                    Civil No. 08-5911 (RHK/SRN)

          Plaintiff,

     v.                                    **REPORT AND RECOMMENDATION**

Michael J. Astrue, Commissioner
 of Social Security,

          Defendant.

---

     Stephen Beseres, Esq., Beseres Law Office, 4124 Quebec Ave. N., Suite 303, New Hope, Minnesota 55427, for Plaintiff.

     Lonnie Bryan, Esq., United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Defendant.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

     Pursuant to 42 U.S.C. § 405(g), Plaintiff Kevin Rodewald seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied Plaintiff's application for disability insurance benefits.  Both parties have filed motions for summary judgment, [Docket No. 8 and 12], and the motions have been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and District of Minnesota Local Rule 72.1.[1]  For the reasons set forth below, the Court recommends that Plaintiff's motion be granted and the case remanded to the Commissioner for further proceedings, and Defendant's motion be denied.

---

[1]    The Court notes that Plaintiff's Memo. of Law in Sup. of Summ. J. (hereinafter "Pl.'s Memo.") does not comply with Local Rule 7.1(e) because the brief is single-spaced and does not adhere to the page-margin requirements.  The Court cautions Plaintiff's attorney to review and comply with the local rules in all future filings.

## I.     BACKGROUND

### A.     PROCEDURAL HISTORY

Plaintiff Kevin Rodewald applied for disability insurance benefits on January 12, 2004, with a protective filing date of December 29, 2003.  (Admin. R. at 111-14.)  He alleged a disability onset date of May 1, 2001, due to limited motion of his ankles, memory loss, Gulf War Syndrome, knee pain, and hip pain.  (Id. at 111-14, 75-80).  The application was denied initially and upon reconsideration.  (Id. at 75-80, 83-86).  Plaintiff requested a hearing before an Administrative Law Judge (ALJ), which was held on October 5, 2006.  (Id. at 27, 87-88).  On November 9, 2006, the ALJ issued an unfavorable decision.  (Id. at 24-33).  The Appeals Council denied a request for further review on September 18, 2008.  (Id. at 7-9.)  The denial of review made the ALJ's decision the final decision of the Commissioner.  See 42 U.S.C. § 405(g); Clay v. Barnhart, 417 F.3d 922, 928 (8th Cir. 2005); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992).

### B.     FACTUAL HISTORY

Plaintiff served in the United States Army from September 17, 1986 to April 17, 1992. (Admin. R. at 116, 176).  From December 1990 to June 1991, his time in the Army included service in the Gulf War in Kuwait and Saudi Arabia.  (Id.).  During his military service in Kuwait, Plaintiff was exposed to oil fire fumes and oil residue on his person, clothes, and food. (Id. at 57).  As a result of both service and non-service related injuries and conditions, Plaintiff received Veterans Affairs (VA) pension and disability benefits.  (Id. at 45).

From an educational perspective, Plaintiff finished high school and some college and had military training as a mechanic.  (Id. at 45-46).  Plaintiff's college coursework was in computers

and he had past work experience as a computer technician for Snyder Drug Stores.  (<u>Id.</u> at 50).

In response to questions about his impairments relative to his school-work, Plaintiff testified that

his obstructive sleep apnea and chronic fatigue interfered with his educational performance.  (<u>Id.</u>

at 45).  At the time of the hearing, Plaintiff had not been employed full-time since the onset of

his disabilities, but had worked part-time for Guardian Pharmacy in 2005 delivering medications

to assisted living facilities.  (<u>Id.</u> at 50-51).  At Guardian Pharmacy, Plaintiff reported he had

difficulties doing his job because of his hypersomnolence, and as a result, he was taking twice

the recommended dose of Ritalin in order to work.  (<u>Id.</u> at 51).

At the time of the hearing, Plaintiff was six feet tall and weighed 280 pounds.  (<u>Id.</u> at 45).

With regard to his daily activities, Plaintiff testified that he was generally able to take care of

himself in feeding, dressing, and bathing.  (<u>Id.</u> at 47).  Plaintiff stated that "sometimes" he

assisted with cooking, cleaning, and grocery shopping, but mostly his wife did those tasks.  (<u>Id.</u>).

Because of his obesity, Plaintiff reported that he tried to work out at the gym up to two or three

times per week to lose weight.  (<u>Id.</u> at 48).

Plaintiff reported mobility and ambulatory problems due to his ankle pain, bone spurs,

and degenerative changes in his knees.  (<u>Id.</u> at 52-53).  Plaintiff testified that he did not have any

difficulties driving and that he could walk a mile "[i]f I had to," but that his joint pain, bone

spurs, and nerve damage would interfere with his ability to walk.  (<u>Id.</u> 45, 46-47).  In response to

the ALJ's question, "your hands and arms, are they working all right?" Plaintiff stated "[t]hey

work okay."  (<u>Id.</u> at 47).  Plaintiff's apnea was helped by his use of a continuous positive airway

pressure (CPAP) machine but he nevertheless experienced sleepiness and sometimes was so

lethargic he could not do anything.  (<u>Id.</u> at 54).  Because of these symptoms, Plaintiff testified he

had to lie down during the day, for one half hour at a time, at least four or five days per week. (Id. at 55-56).   Upon questioning from his attorney, Plaintiff reported that he had memory problems and loss of concentration.  (Id. at 58).   As the ALJ noted in his decision (Id. at 32), Plaintiff took a trip to the Sturgis motorcycle rally in August 2006.  (Id. at 48).   Because of Plaintiff's impairments and difficulties sitting, Plaintiff's wife drove for this trip and Plaintiff lay in the back of the van.  (Id.).  Because of possible food poisoning and in response to stress from the trip, Plaintiff was hospitalized at Sturgis.  (Id. at 48-49).

## C.   MEDICAL EVIDENCE IN THE RECORD

### 1.   Evidence Predating Disability Onset Date

As evidenced in the medical records, Plaintiff sought treatment for his impairments at the Veterans Affairs (VA) Medical Center in Minneapolis.[2]  Prior to the onset date of Plaintiff's disability, Plaintiff's medical history is significant for multiple treatments at the VA Medical Center for lower back pain and strains.  (Id. at 358, 378-79, 380, 381, 382).  On these occasions Plaintiff was prescribed rest and Tylenol.   (Id.).   Plaintiff also experienced repeated ear infections during 1993 and 1994, possibly related to Gulf War Syndrome.  (Id. at 460, 463, 464-65, 466-68, 469, 470-71, 473-74, 484-85, 486-87).

Plaintiff visited the VA Medical Center on May 31, 1995, for an evaluation of knee pain and problems.  (Id. at 448, 557-58).   At the doctor's visit, Plaintiff reported constant pain, unrelated to any activity, and pain with prolonged sitting or standing.  (Id. at 448).   X-rays showed Plaintiff's left knee was normal, but his right knee showed a mild tilt of the left patella

---

[2]   Plaintiff received treatments for certain temporary conditions unrelated to his allegedly disabling impairments (i.e. gastroesophageal reflux disease, optometry prescriptions and visits, etc.).   Medical treatment for these conditions will not be discussed in this Report and Recommendation, unless those medical records discussed or related to one of Plaintiff's allegedly disabling impairments.

and mild degenerative changes with small spurs and lateral compartment narrowing.  (<u>Id.</u> at 557-58).

On June 6, 1995, Dr. Alfredo Jacome evaluated Plaintiff for Gulf War Syndrome.  (<u>Id.</u> at 447).  Plaintiff reported that, since returning from Saudi Arabia, he experienced knee and shoulder pain, headaches, lack of concentration, dizziness, and twitching in his muscles.  (<u>Id.</u>). Dr. Jacome noted in the medical records that Plaintiff's symptoms had not changed over the past three years and were not affecting Plaintiff's school or work performance.  (<u>Id.</u>).  Dr. Jacome concluded, however, "[t]he patient shares many of the symptoms of the so-called Gulf War Syndrome."  (<u>Id.</u>).

On August 25, 1995, Dr. Raymond Scallen examined Plaintiff at the VA Medical Center for Plaintiff's knee, ankle, and shoulder pain.  (<u>Id.</u> at 440-42).  Dr. Scallen's examination did not reveal any range of motion deficiencies in Plaintiff's shoulders.  (<u>Id.</u>).  The physical examination of Plaintiff's knees showed hypermobile patella and clicking in the knees, but with full range of motion.  (<u>Id.</u>).  The radiology report revealed mild degenerative changes in the right knee but little change in Plaintiff's shoulders.  (<u>Id.</u> at 510, 554-55).  Dr. Scallen diagnosed bilateral patellofemoral syndrome[3] and service-related asthma.  (<u>Id.</u> at 440-41).

Plaintiff visited the VA Medical Center Walk-In Clinic on July 22, 1996, for severe ankle pain.  (<u>Id.</u> at 422-23).  X-rays of Plaintiff's ankles were normal at this visit.  (<u>Id.</u> at 553).  After waiting a number of hours, Plaintiff left before being seen by a doctor.  (<u>Id.</u> at 423).

On March 13, 1997, Plaintiff visited the Urgent Care Center with a complaint of right knee pain.  (<u>Id.</u> at 415-16).  Having slipped on some ice three weeks earlier, Plaintiff reported he

---

[3]     Knee pain due to a structural or functional disturbance in the relation between the patella and distal femur.  <u>Stedman's Medical Dictionary</u>, Syndrome, Patellofemoral Syndrome.  (27th Ed. 2000).

had re-injured his knee and was experiencing pain and swelling.  (Id. 415).  X-rays showed degenerative changes in Plaintiff's right knee, most prominently in the lateral compartment.  (Id. at 552).  The doctor prescribed Plaintiff an anti-inflammatory and pain reliever.  (Id. at 415).

Dr. Sandra Lundgren examined Plaintiff for a Neuropsychological Screening on August 28, 1997.  (Id. at 400-403).  At the screening Plaintiff reported symptoms of knee pain, ankle pain, neck pain, headaches, chronic fatigue, memory problems and an inability to concentrate. (Id. at 400-01).  Dr. Lundgren's examination revealed that Plaintiff rated average in intelligence and he showed mild to moderate deficits in memory, verbal recall, and the ability to learn and retain word pairs.  (Id. at 401-02).  Dr. Lundgren diagnosed a mild learning disorder, but noted "mild verbal learning disorder . . . is more likely to be a reflection of emotional factors, or a developmental weakness given his history of dyslexia, rather than a new structural decline in brain function."  (Id. at 402).

On September 8, 1997, Dr. Samuel Berman of the VA Medical Center examined Plaintiff for a disability compensation and rating examination related to Plaintiff's general medical health. (Id. at 390-96).  At the examination, Plaintiff reported fatigue, as well as, joint pain in the knees, ankles, shoulders, and wrists.  (Id. at 390).  Because of his shoulder, arm and wrist pain, Plaintiff stated he had difficulty gripping things when he used his hands a lot and he could not work above his shoulders.  (Id. at 390, 392).  Plaintiff also noted that the constant joint pain in his ankles, knees, wrists, and shoulders worsened with strenuous activity.  (Id. at 390, 391).  In describing his knee pain, Plaintiff rated his pain as moderate, present 90% of the time, and aggravated by standing or walking.  (Id. at 391).  Plaintiff also noted that his knee problems prevented him from stooping down.  (Id. at 392).  Besides his joint problems, Plaintiff reported

memory loss and problems with memory recall, especially in school situations.  (Id. at 391).  Dr. Berman noted that Plaintiff's x-rays showed degenerative disc disease in Plaintiff's right knee. (Id. at 392, 549).  X-rays of Plaintiff's left knee, shoulders and wrists were all normal other than calcifications from Plaintiff's previous shoulder surgery.  (Id. at 543-49).  Dr. Berman questioned Plaintiff with respect to the Deluca[4] requirements and Plaintiff responded that the pain in his knees, shoulders, and testicle significantly limited his functional ability and his range of motion.  (Id. at 392).  Plaintiff asserted that his ankle pain increased with walking and resulted in a 35% to 40% loss of range of motion.  (Id.).  Dr. Berman's physical examination revealed tenderness in Plaintiff's shoulders, elbows, wrists, knees, and ankles, and a decreased range of motion in Plaintiff's right shoulder.  (Id. at 393).  Dr. Berman diagnosed:  degenerative arthritis in Plaintiff's right knee; residual ligament calcification in Plaintiff's right shoulder (post Weaver-Dunn surgical procedure), and accompanying decreased range of motion; fatigue, and sleep apnea.  (Id. at 394-95).  Dr. Berman did not diagnose fibromyalgia because Plaintiff did not have pain on specific pressure points.  (Id. at 394).  Dr. Berman also noted that he could neither confirm nor deny whether Plaintiff was suffering from Gulf War Syndrome.  (Id. at 394-95).

Dr. Gilbert Westreich performed a compensation and rating examination on Plaintiff on September 8, 1997, related to Plaintiff's neurological health.  (Id. at 396-98).  At the neurological examination, Plaintiff reported severe headaches for the past five years[5] and pain in his knees,

---

[4]    Deluca requirements are the Veterans Affairs standards for evaluating a musculoskeletal disability and degree of functional loss due to pain, arising out of the case, DeLuca v. Brown, 8 Vet. App. 202 (Vet. App. 1995).

[5]    Plaintiff's attorney states that Plaintiff has daily headaches and the longest time period he went without a headache was four or five days.  (Pl.'s Memo. at 4).  Plaintiff did visit the VA Medical Center for headaches on a number of occasions.  (Admin. R. at 424, 425).  However, an examination of the medical records does not contain any reports of significant headaches or daily headaches after the alleged onset of disability in May 2001.

ankles, and shoulders.  (Id. at 396-97).  Dr. Westreich concluded that Plaintiff did not have any neurological disease, but that Plaintiff suffered from a somatization disorder.[6]  (Id. at 398).

With respect to his apnea, Dr. Thomas Hurwitz first evaluated Plaintiff at the VA Medical Center's Sleep Center on April 15, 1998, after a referral from the pulmonary clinic for Plaintiff's persistent and excessive daytime sleepiness.  (Id. at 371-373).  Plaintiff reported that, following his service in the Gulf War, he had an increase in sleepiness.  (Id. at 371).  His general sleepiness and daytime sleepiness increased substantially over time and affected Plaintiff's functioning in school.  (Id.).  Plaintiff was originally diagnosed with sleep apnea in January 1996 at Abbott Northwestern Hospital and he was prescribed a CPAP.  (Id.).  Dr. Hurwitz noted that Plaintiff's apnea had improved with the use of the CPAP, but that Plaintiff still experienced fatigue, sleepiness, and drowsiness while driving.  (Id.).  Dr. Hurwitz continued Plaintiff on the CPAP and prescribed Methylphenidate (Ritalin).  (Id. at 373).  From 1998 to 2000, Plaintiff continued to see Dr. Hurwitz for his apnea, without any major changes in his symptoms or medications.  (Id. at 346, 354, 366).

On January 3, 2000, Plaintiff visited the VA Medical Center after falling on some ice and injuring his left shoulder.  (Id. at 539-41).  The x-ray of Plaintiff's neck revealed a reversal in the usual cervical curvature suggesting paravertebral muscle spasm.  (Id. at 540).  The x-ray of Plaintiff's left shoulder was normal.  (Id. 540-41).

On February 16, 2000[7], the VA Medical Center completed a chronic fatigue examination as part of Plaintiff's application for VA disability benefits.  (Id. ay 337- 342).  Dr. William Fifer noted that Plaintiff reported experiencing joint pain, chronic fatigue, memory loss, concentration

---

[6]     The existence of physical bodily complaints in the absence of a known medical condition. Stedman's Medical Dictionary, Disorder, Somatization Disorder, (27th Ed. 2000).

[7]     The accompanying report was completed on March 15, 2000.  (Id. at 337).

loss, sleep apnea, and gastritis.  (Id. at 338).  The physical examination revealed limitations in lumbar motion including, flexion to 85 degrees, extension to 30 degrees, lateral flexion to 30/30, and rotation to 30/30.  (Id.).  Dr. Fifer did not find any limitations in shoulder, wrist, ankle, or knee movements.  (Id.).  In summary Dr. Fifer stated, "veteran is a very complicated case whose main problem, I think, is multiple joint pain.  He has pain in all his joints.  They never swell or cause him any difficulty, except he cannot stand for long periods of time because he gets pain in his joints.  He also has memory loss, and loss of concentration and sleep apnea."  (Id.).

Dr. Westreich examined Plaintiff's neurological health again on February 24, 2000, for an updated disability compensation examination.  (Id. at 339-40).  At that examination, Plaintiff reported headaches, light sensitivity, jaw pain, shortness of breath, lung pain, and numbness in his hands.  (Id. 339-40).  Regarding Plaintiff's physical impairments, Dr. Westreich noted that Plaintiff had a history of right shoulder surgery, right knee surgery, and right hernia repair.  (Id. at 340).  Dr. Westreich again diagnosed somatization disorder.  (Id. at 341).

On March 1, 2000, Dr. Sandra Lundgren completed a Brief Neuropsychological Reevaluation, (following Plaintiff's initial screening in August 1997), related to his application for VA disability compensation.  (Id. at 334-336).  Related to his chronic fatigue, Plaintiff reported an increase in frustration, moodiness, irritability, lack of concentration, and memory loss.  (Id. at 334, 335).  Because of headaches and pain in his ankles, knees, and teeth, Plaintiff reported taking up to ten aspirin per day.  (Id.).  The neurological testing revealed a mild verbal learning deficit, a history of dyslexia, and a tendency to develop physical symptoms in response to emotional distress.  (Id.).  While Plaintiff was able to walk independently, he reported continuing pain in his ankles and knees, and increased shoulder pain since his last evaluation.

(Id. at 335).  Plaintiff's intelligence on the Weschler Adult Intelligence Scale-III was rated as average to low-average.  (Id. at 335).  On the Weschler Memory Scale, Plaintiff scored in the average or low-average rating for all tests.  (Id.).  Regarding his emotional status, Dr. Lundgren determined that Plaintiff's responses on the MMPI-2 were of questionable validity because of a defensive approach in which the Plaintiff tended to deny shortcomings.  (Id.).  Nonetheless, Plaintiff's results were similar to the August 1997 findings and were "notable for predominant focus on physical symptoms in a patient who relies on denial and repression to deal with stress. Symptoms suggestive of mild depression . . . He would have difficulty expressing negative emotions . . . and would be more likely to develop physical symptoms instead."  (Id.).  Dr. Lundgren concluded that, in comparison to Plaintiff's status prior to his impairments, Plaintiff was "showing moderate to severe deficits on tests of immediate verbal memory . . . milder deficits in immediate recall of paragraph length verbal material, visual spatial reasoning, and immediate and delayed recall of geometric designs . . . Emotional state is characterized by a focus on somatic symptoms."  (Id. at 336).  Dr. Lundgren diagnosed a moderate learning disorder as compared to the time before Plaintiff's impairments.  (Id.).

On November 16, 2000, Plaintiff visited Dr. Hurwitz for a follow-up examination of his sleep apnea.  (Id. at 719-20).  Plaintiff was experiencing increasing fatigue and had to leave work on at least two occasions because he was too tired to work.  (Id. at 720).  Dr. Hurwitz opined that Plaintiff's joint pain might be a contributing factor to his sleep difficulties and therefore, he requested a consultation with the Psychology Pain Program.  (Id. at 613).  Dr. Hurwitz asked the psychology department to evaluate and aid Plaintiff with his musculoskeletal pain, and to provide him with some stress management techniques to aid his sleep.  (Id.).

Pursuant to that consultation request, psychologist Dr. Dixie Grace evaluated Plaintiff on December 22, 2000.  (Id. at 613-15).  During the visit, Plaintiff rated his shoulder pain (on a scale of one to ten) as five to six, his back pain a five, his hip pain a five to six, his knee pain a four, and his ankle pain a three to four.  (Id. at 613).  Plaintiff also reported to Dr. Grace that he experienced chronic fatigue and tension headaches.  (Id. at 613-14).  At that time Plaintiff was taking six aspirin per day to treat his pain and reported that in the past he took as many as twenty aspirin per day.  (Id. at 614).  Dr. Grace diagnosed somatization disorder and stated Plaintiff "is so focused on physical sensations that insight is poor."  (Id.).  To help Plaintiff with weight loss and pain management Dr. Grace referred Plaintiff to a relaxation skills class and for training in self-hypnosis.  (Id.).  Dr. Grace rated Plaintiff's GAF as 65.[8]  (Id.).

On January 8, 2001, Dr. Hurwitz had a follow-up appointment with Plaintiff for his sleep apnea and hypersomnolence (a need for excessive amounts of sleep).  (Id. at 717-18).  With respect to his ability to fall asleep Plaintiff reported he was "at least fifty percent better" than his last visit with Dr. Hurwitz.  (Id. at 717).  Plaintiff stated, however, that his better sleep had not improved his daytime drowsiness.  (Id.).  Plaintiff was taking approximately 25 mg of Ritalin per day.  (Id.).  Dr. Hurwitz considered that Plaintiff might require more Ritalin and also prescribed Zaleplon.  (Id.).

---

[8]      A Global Assessment of Functioning (GAF) score is a doctor's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders Text Revision, 32-34 (4th ed. 2000).  While generally an individual with a GAF of 61 through 70 can function relatively well and have some meaningful interpersonal relationships, that GAF score is characterized by some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning. Id.  The Eighth Circuit has noted that a GAF score of 65 represents a mild impairment.  Sloan v. Astrue, 499 F.3d 883, 885 (8th Cir. 2007).

Dr. Grace treated Plaintiff on January 23 and 30, 2001, for relaxation and self-hypnosis training.  (Id. at 716-17).  On March 20, 2001, Dr. Grace followed-up with Plaintiff in the VA Behavioral Health Clinic.  (Id. at 714-15).  At the appointment Plaintiff reported an increase in headaches, with no apparent cause, and continued daytime fatigue.  (Id. at 714).  Plaintiff continued to use his relaxation and self-hypnosis skills for weight loss and pain management, but not on a regular basis.  (Id. at 715).

On April 12, 2001, Plaintiff again consulted with Dr. Hurwitz for a follow-up on his sleep apnea and hypersomnolence.  (Id. at 713-14).  Dr. Hurwitz stated Plaintiff was doing "reasonably well" but still had fatigue and daytime drowsiness.  (Id. at 714).  Dr. Hurwitz recommended Plaintiff see an endocrinologist because Plaintiff had a family history of thyroid problems.  (Id.).

## 2.      Medical Records Between the Onset Date and the ALJ's Decision

On June 26, 2001, Plaintiff had x-rays completed for evaluation of degenerative disk disease in his spine.  (Id. at 237-38, 536).  Plaintiff complained of lower back pain as a result of an injury he sustained while moving some equipment.  (Id. at 312).  X-rays of Plaintiff's back and neck were normal other than minimal osteophytes (bone spurs).  (Id. at 536).  Dr. Christopher Bowron noted tenderness in the midline of the lumber spine but no range of motion difficulties.  (Id. at 312).  Dr. Bowron prescribed naproxen for Plaintiff's pain.  (Id.).

Plaintiff once again consulted Dr. Hurwitz on October 1, 2001, for follow-up on his sleep apnea and hypersomnolence.  (Id. at 226-27).  Dr. Hurwitz maintained that Plaintiff was doing well and was experiencing less fatigue since receiving thyroid replacement therapy, and accordingly, Dr. Hurwitz decreased Plaintiff's Ritalin to approximately 20 mg per day.  (Id. at 226).

Plaintiff requested and received a refill of his Ritalin from Dr. Hurwitz on December 26, 2002. (Id. at 226). Dr. Hurwitz again reported that Plaintiff used less Ritalin after being treated for hypothyroidism, but that Plaintiff still required the medicine for certain activities such as driving. (Id.).

On April 15, 2002, Dr. Hurwitz examined Plaintiff for his apnea and hypersomnolence. (Id. at 224-25). Dr. Hurwitz reported that Plaintiff was doing "quite well" and slept for six to eight hours at a time. (Id. at 224). Laboratory studies at the consultation showed Plaintiff suffered from mild obstructive sleep apnea and excessive sleepiness. (Id.). Dr. Hurwitz stated that Plaintiff's excessive sleepiness was out of proportion to the degree of sleep disordered breathing and therefore, recommended Plaintiff continue with the Ritalin.[9] (Id.).

On June 30, 2002, Plaintiff visited Dr. Kathryn Lilley at the VA Urgent Care Center for left ankle pain. (Id. at 221-24). Plaintiff had tripped on a curb and twisted his ankle resulting in pain, swelling, and limited range of motion. (Id. at 221-22). An x-ray showed no acute fracture or dislocation, but did show calcaneal (heel) bone spurs and Plaintiff's previous fracture. (Id. at 222, 236, 535). Dr. Lilley bandaged Plaintiff's ankle and prescribed rest, ice, elevation of the ankle, and over-the-counter pain medication. (Id. at 222, 236).

Plaintiff consulted Dr. Kathryn Rice in the VA Pulmonary clinic on August 23, 2002, for a follow-up on Plaintiff's sleep apnea. (Id. at 219-220). Plaintiff reported using his CPAP machine 97% of time and that it helped him feel more rested. (Id. at 219). Dr. Rice also noted Plaintiff experienced hypersomnolence, which was being treated by Dr. Hurwitz with Ritalin. (Id.).

---

[9]     At times the medical records attribute or classify Plaintiff's hypersomnolence and Ritalin treatment as part of his chronic fatigue syndrome. (See e.g. Admin. R. at 338).

On October 21, 2002, Plaintiff again saw Dr. Hurwitz for his sleep apnea and hypersomnolence.  (Id. at 218-19).  Dr. Hurwitz reported Plaintiff "[was] doing quite well."  (Id. at 218).  Plaintiff continued to use Ritalin to support wakefulness but used the medication only occasionally.  (Id.)

Plaintiff saw Dr. Craig Roth and resident Dr. Suhas Bhat at the VA Medical Center on November 21, 2002, for routine health maintenance.  (Id. at 214-17).  The medical record indicates active medical problems of hypothyroidism, obstructive sleep apnea, degenerative joint disease and chronic fatigue.  (Id. at 214).  Plaintiff reported a history of ten years of bilateral ankle pain and degenerative joint disease.  (Id.).  At the appointment with Dr. Bhat, Plaintiff did not have morning stiffness, swelling, or redness of the joints, but Plaintiff's pain was worse in the evenings.  (Id.).  Dr. Bhat's examination revealed Plaintiff had full range of motion in his joints and no back pain or muscle pain.  (Id.).  Plaintiff "[felt] he [did] not need meds now."  (Id. at 216).  To treat Plaintiff's joint pain, Dr. Bhat recommended a gentle exercise program and glucosamine/chondroitin.  (Id.).

On December 12, 2002, Plaintiff spoke to Dr. Hurwitz by telephone regarding his sleep apnea.  (Id. at 213-14).  Plaintiff reported having some problems with sleepiness and depression in recent months and consequently Dr. Hurwitz recommended a follow-up visit.  (Id. at 213).

Dr. Salima Mithani examined Plaintiff in the VA Medical Center Urgent Care for an injury to his hands on January 7, 2003.  (Id. at 209-13).  Plaintiff injured himself when a break-away chiropractor table fell on his hands.  (Id. at 210).  Plaintiff suffered a cut on his right fifth finger from the metallic edge of the table, but his finger was not fractured.  (Id. at 210, 234, 533).  Dr. Mithani treated Plaintiff's injury with ibuprofen and a tetanus shot.  (Id. at 210).

The VA Medical center completed various x-rays for Plaintiff on April 9, 2003, in connection with Plaintiff's re-application for VA disability benefits. (Id. at 117, 232-34). The radiologist, Dr. Quentin Anderson, compared Plaintiff's x-rays with his previous x-rays from September 1997. (Id. at 531). Dr. Anderson reported that the x-rays of Plaintiff's knees revealed moderate-severe degenerative changes in the medial and lateral compartment of the right knee and slight progression of degenerative changes in the medial compartment of the left knee. (Id. at 232-34, 531-32).

Dr. Hurwitz examined Plaintiff again on April 25, 2003, for counseling and medication management of his sleep apnea. (Id. at 205-06). Dr. Hurwitz noted that Plaintiff was continuing to do "reasonably well," but still reported some daytime drowsiness. (Id.). Dr. Hurwitz also remarked that Plaintiff had a long history of hypersomnolence, "which has been thought to be out of proportion with the degree of obstructive sleep apnea." (Id. at 206). Dr. Hurwitz continued Plaintiff on the CPAP machine and Ritalin. (Id.). The next month, on May 29, 2003, Dr. Hurwitz readjusted Plaintiff's CPAP machine. (Id. at 205).

On July 17, 2003, Plaintiff consulted with Dr. Roth and Dr. Bhat for a follow-up on his lab results. (Id. at 199-204). Noting Plaintiff's CPAP and Ritalin were recently adjusted, Dr. Bhat reported that Plaintiff experienced mild fatigue, but no excessive daytime sleepiness. (Id. at 200). Dr. Bhat determined that with Plaintiff's prescribed Synthroid, Plaintiff's labs showed his TSH (thyroid stimulating hormone) within a normal range. (Id. at 200-01). At that visit Plaintiff was also experiencing gastro-intestinal symptoms and was prescribed Zantac. (Id. at 202).

On September 5, 2003, Plaintiff saw Dr. Rice in the VA Pulmonary Clinic. (Id. at 197-98). Plaintiff reported experiencing good results with the CPAP machine but required a re-

adjustment to his mask.  (Id. at 197).  At the appointment check-in Plaintiff reported an increase in right hip pain, rating the pain intensity as 6 out of 10.  (Id. at 198).

On October 16, 2003, Plaintiff visited the VA Urgent Care Center because of left ankle pain.  (Id. at 193-196).  Plaintiff reported that he had experienced pain on and off for many years and the current episode had lasted for ten days.  (Id. at 194).  Dr. Donald Weinshenker and resident Dr. Suruchi Kaul noted no changes on Plaintiff's ankle x-ray, but did find evidence of edema (swelling) and pain in Plaintiff's ankle with movement.  (Id. at 194 and 529-30).  Dr. Kaul reported that while Plaintiff did not have any acute bone or joint abnormality, he did have a "moderate-sized" bone spur.  (Id. at 195, 231).  The VA Medical Center treated Plaintiff's ankle with an ace bandage and ibuprofen.  (Id.).

Plaintiff visited Dr. Weinshenker and Dr. Bhat on October 23, 2003, for a follow-up consultation on Plaintiff's obesity, hypothyroidism, sleep apnea, and ankle pain.  (Id. at 188-191).  At the appointment Plaintiff reported pain in his shoulders, left hand, knees, lower back, and left ankle.  (Id. at 191).  Dr. Weinshenker remarked that Plaintiff was not having excessive day time fatigue and that he had been losing 1-2 pounds per month.  (Id.).  Dr. Bhat noted Plaintiff's recent experience with left ankle pain, likely due to a sprain, and treated the ankle with ice-packs and a capsaicin topical treatment.  (Id. at 190-91).

On October 27, 2003, Plaintiff again consulted Dr. Hurwitz in the Sleep Center for his sleep apnea and hypersomnolence.  (Id. at 186-87).  Dr. Hurwitz noted that with use of the CPAP machine, Plaintiff slept well and was getting nearly eight hours of sleep nightly.  (Id. at 186).  At that time, Plaintiff was taking Ritalin which rendered Plaintiff awake and alert, but only after a

"slow start" in the morning.  (Id.).  At the visit, Dr. Hurwitz prescribed Modafinil instead of the Ritalin because it would have an earlier onset time.  (Id.).

Dr. Charles Grant, a state agency medical consultant, completed a physical functional capacity examination on February 27, 2004, based on Plaintiff's diagnoses of ankle pain, sleep apnea, and obesity.  (Id. at 245-52).  Dr. Grant concluded that:  Plaintiff could occasionally lift 20 pounds; frequently lift 10 pounds; stand or walk for about 6 hours in an eight hour work-day; and perform unlimited pushing and pulling motions.  (Id. at 246).  Dr. Grant also determined that Plaintiff did not suffer from any postural, manipulative, visual, communicative, or environmental limitations.  (Id. at 247-49).  Dr. Aaron Mark, another agency consultant, affirmed Dr. Grant's assessment.  (Id. at 252).

Another state agency medical consultant, Dr. Sharon Frederiksen, completed a mental functional capacity examination on March 1, 2004, based on Plaintiff's diagnosis of an affective disorder.  (Id. at 254-267).  Dr. Frederiksen concluded that Plaintiff suffered from a mental impairment but that the impairment was not severe.  (Id. at 254).  Dr. Frederiksen opined that Plaintiff suffered from a depressive mood disorder characterized by sleep disturbance.  (Id. at 257).  Based on this impairment, Dr. Frederiksen concluded that Plaintiff was mildly limited in performing the activities of daily living; maintaining social functioning; and maintaining concentration persistence and pace.  (Id. at 264).  She also concluded that Plaintiff would not experience episodes of decompensation.  (Id.).

Plaintiff again visited Dr. Hurwitz on March 4, 2004, for follow-up on his sleep apnea and hypersomnolence.  (Id. at 286-288).  Dr. Hurwitz stated "[h]e continues to do nicely. Furthermore, he has found Modafinil to be very effective in helping him maintain alertness and

possibly more beneficial than was [Ritalin]." (Id. at 287).  Plaintiff was usually taking the Modafinil twice per day, to maintain alertness, and he continued to use his CPAP machine.  (Id. at 287).  Dr. Hurwitz reported, "he reports a long history of excessive sleepiness that has responded to both CPAP and Modafinil." (Id.).

Dr. Flynn treated Plaintiff in the VA Urgent Care Center on March 26, 2004, and diagnosed a left ankle sprain and bone spurs.  (Id. at 282-86).  At that visit Plaintiff classified his pain as an eight out of ten and reported that his pain started after he went snorkeling and wore fins.  (Id. at 283-84).  The examination of Plaintiff's ankle showed no abrasions, but did show swelling, tenderness, and pain with movement.  (Id. at 284-85).  Plaintiff was prescribed Salsalate, (an anti-inflammatory/pain medicine), ice, and rest.  (Id. at 282, 285).

On March 28, 2004, Plaintiff again visited the VA Urgent Care Center for foot pain that had increased since his previous treatment two days earlier.  (Id. at 278-282).  Dr. Glennon Park noted that Plaintiff had chronic difficulties with his feet and ankles since his military service and that Plaintiff experienced pain whenever he stepped flat on the ground.  (Id. at 279).  Dr. Park determined that Plaintiff had mild swelling in the forefoot and ankle with accompanying tenderness.  (Id. at 280).  Dr. Park diagnosed tendonitis and prescribed ice, crutches, and Salsalate.  (Id. at 280, 282).

On April 22, 2004, Plaintiff visited Dr. Roth and resident Dr. Odette Helou for follow-up on his active conditions and for routine health maintenance.  (Id. at 275-278).  Dr. Helou noted Plaintiff suffered from chronic fatigue syndrome, pain in his arms, legs, hands and feet, hypothyroidism, sleep apnea, obesity and a history of gynecomastia and an ankle sprain.  (Id. at 277-78).  Plaintiff reported that he was still experiencing pain in his left foot but he did not want

to try prescription pain medication at that time.  (Id. at 277).  During the doctor appointment, Plaintiff rated his foot pain as a five out of ten.  (Id. at 276).

On June 29, 2004, Dr. Cliff Phibbs, another state agency medical consultant, completed a physical functional capacity assessment on Plaintiff for his conditions of morbid obesity, degenerative disc disease, and sleep apnea.  (Id. at 299-306).  Dr. Phibbs concluded:  Plaintiff could occasionally lift twenty pounds; frequently lift ten pounds; stand or walk for two hours in an eight hour work-day; and sit for about six hours in an eight hour work-day.  (Id. at 300).  Dr. Phibbs also concluded that Plaintiff was limited in pushing and pulling in his lower extremities but that Plaintiff did not have any postural, manipulative, visual, or communicative limitations. (Id. at 300-03).  Dr. Phibbs also determined that in terms of environmental limitations, Plaintiff should avoid concentrated exposure to hazards (machinery, heights, etc.).  (Id. at 303).  Finally, Dr. Phibbs opined that Plaintiff suffered from a medically determinable impairment but that the severity or duration of the impairment was disproportionate to the impairment's expected severity or duration.  (Id. at 304).

Dr. Weinshenker and Dr. Helou examined Plaintiff on August 26, 2004, for a follow-up on Plaintiff's ankle pain and hypothyroidism.  (Id. at 652-56).  Plaintiff reported that his ankle pain had been increasing since February 2004, and therefore, he was unable to exercise or sustain walking because of the pain.  (Id. at 653).  Plaintiff told the doctors he was reluctant to take pain medication because of the possible damage it could do to his kidneys.  (Id.).  A physical examination of Plaintiff's ankles revealed normal range of motion but pain and tenderness on palpation.  (Id. at 654).  At that time, Plaintiff's hypothyroidism was stable.  (Id.).  The doctors diagnosed chronic ankle pain attributable to degenerative disc disease and obesity.  (Id. at 652).

Dr. Hurwitz treated Plaintiff for his sleep apnea and hypersomnolence on September 13, 2004 and Plaintiff's symptoms and treatment remained unchanged from past visits. (<u>Id.</u> at 651).

Plaintiff consulted the VA orthopedics department on September 21, 2004, on a referral from Dr. Helou. (<u>Id.</u> at 528-29, 589-594). The orthopedist, Dr. Kenneth Kleist, noted that Plaintiff had a 12 year history of bilateral ankle pain with repeated ankle sprains. (<u>Id.</u> at 592). Plaintiff reported to Dr. Kleist that his ankle pain was worse upon walking, but he sometimes also experienced pain with any range of motion in the ankle. (<u>Id.</u>). Dr. Kleist noted Plaintiff's past history of chronic fatigue, hypothyroidism, sleep apnea, and multiple ankle sprains and remarked that Plaintiff was not working because of his difficulties in moving. (<u>Id.</u> at 592-93). The radiologist determined that x-rays of Plaintiff's ankles showed "similar changes in the right and left with joint space narrowing with evidence of early arthritis . . . On the left ankle, the lateral reveals there is obvious impingement with a small osteophyte on the tibia, as well as a larger one on the talus. On the right . . . it is narrowed anteriorly in the joint space." (<u>Id.</u> at 593). Dr. Kleist diagnosed:  bilateral, mild degenerative disc disease of the ankle joint; peroneal tendonitis bilaterally; calcaneal varus bilaterally (inward turning of the heels); and tight gastrocsoleus, (the muscles in back of the lower leg), on the left. (<u>Id.</u> at 593). Dr. Kleist recommended orthotics and if Plaintiff's symptoms did not improve with use of the orthotics, "we may need to do some more aggressive diagnostic testing." (<u>Id.</u> at 593-94).

Plaintiff participated in the VA weight loss program from January 3, 2005 to January 14, 2005, and lost 24 pounds during the program. (<u>Id.</u> at 584, 594-97, 632-48). Dr. Helou, who referred Plaintiff to the weight loss clinic, noted Plaintiff had poor exercise abilities because of his ankle pain and Plaintiff confirmed that his exercise abilities were limited because of his ankle

and knee pain.  (<u>Id.</u> at 594, 596, 639).   Ultimately, Plaintiff lost a total of approximately 60 pounds after the program.  (<u>Id.</u> at 620).  The weight loss clinic treatment notes also indicated that Plaintiff was alleviating his joint pain through weekly chiropractic visits.  (<u>Id.</u> at 644).

In February 2005, Plaintiff returned to taking Ritalin, instead of Modafinil, because he experienced headaches with Modafinil.  (<u>Id.</u> at 632).  Dr. Hurwitz followed-up on Plaintiff's apnea and hypersomnolence on April 25, 2005.  (<u>Id.</u> at 631).  At that time, Plaintiff denied that his sleepiness interfered with his performance or safety and he did not describe any significant side effects.  (<u>Id.</u>).  Dr. Hurwitz continued to prescribe Ritalin for Plaintiff's hypersomnolence. (<u>Id.</u>).

On September 9, 2005, Dr. Dina Gad saw Plaintiff for a follow-up on his hypothyroidism.  (<u>Id.</u> at 628).  Based on TSH testing and Plaintiff's reports of lethargy, Dr. Gad determined Plaintiff was under-medicated for his hypothyroidism.  (<u>Id.</u>).  As a result, Dr. Gad increased Plaintiff's Synthroid dose.  (<u>Id.</u>).

Plaintiff saw Dr. Hurwitz on October 31, 2005, for a follow-up of his apnea and hypersomnolence.  (<u>Id.</u> at 626-27).  Plaintiff reported that he was currently not doing well and he was very fatigued from working.  (<u>Id.</u> at 626).  Plaintiff also stated that he was feeling depressed and irritable and conveyed he felt he had never regained his functional capacity since the onset of his impairments.  (<u>Id.</u> at 627).  In response to Plaintiff's report of increased fatigue, Dr. Hurwitz recommended testing of Plaintiff's CPAP machine to ensure it was functioning correctly.  (<u>Id.</u>).

On December 28, 2005, Dr. Basel Aloul treated Plaintiff for a follow-up on his hypothyroidism.  (<u>Id.</u> at 620-22).  Plaintiff reported to Dr. Aloul that his feet numbness had

improved since he quit working. (Id. at 620). At that visit, Plaintiff's TSH levels were normal. (Id. at 622).

As of December 30, 2005, the VA Medical Center record compilation noted Plaintiff had been diagnosed with the following active problems: obesity; prior ankle sprain; sleep apnea; hypothyroidism; arm, leg, hand and foot pain; and chronic fatigue syndrome. (Id. at 521-24).

Plaintiff visited Dr. Charles Billington on March 29, 2006, for follow-up on his obesity and sleep apnea. (Id. at 726-27). Plaintiff continued to work on losing weight and exercising and continued to treat his hypothyroidism with Synthroid. (Id. at 726).

Plaintiff visited the Black Hills VA Health Center while attending the Sturgis motorcycle rally on August 8-9, 2006. (Id. at 728-32). During the rally Plaintiff sought treatment because he experienced gastrointestinal problems of an unknown origin. (Id. at 730-31).

## D.   DECISION OF DEPARTMENT OF VETERANS AFFAIRS

On July 9, 2003, the Department of Veterans Affairs determined that Plaintiff was 100% disabled as a result of both service related and non-service related conditions. (Id. at 116-125). The VA concluded Plaintiff was entitled to Veteran's disability benefits effective as of January 15, 2003, due to impairments of: somatization disorder; bilateral degenerative joint disease in ankles and knees (with limitation of motion); history of ankle sprains; chronic fatigue syndrome; right shoulder dislocation (post Weaver-Dunn procedure); nasal fracture with septal deviation; and Gulf War Syndrome. (Id. at 123-125). With specific regard to Plaintiff's physical impairments, the VA determined that, based on the compensation examination performed on April 9, 2003, Plaintiff had established a service connected disability for degenerative joint disease in both of Plaintiff's knees and ankles. (Id. at 117-18). The VA based this determination

on the medical evidence showing limited range of motion in the joints and the plaintiff's reports of chronic pain.   (Id.).   The VA determined that Plaintiff was 10% disabled from his somatization disorder as of 1995 and 30% as of the February 16, 2000, examination by Dr. Fifer. (Id. at 123).

### E.      EVIDENCE FROM THE MEDICAL EXPERT

A medical expert (ME), Dr. Joseph Horozaniecki, testified at the administrative hearing. (Id. at 60-64).   Dr. Horozaniecki based his medical conclusions on Plaintiff's diagnoses of: idiopathic hypersomnolence; obstructive sleep apnea; bilateral ankle pain and degenerative joint disease; right shoulder pain and degenerative joint disease; right knee pain and degenerative joint disease; and obesity.   (Id. at 61).   Dr. Horozaniecki concluded that none of Plaintiff's other impairments were acute.   (Id.).   In response to questions from the ALJ, Dr. Horozaniecki testified he did not believe that Plaintiff's impairments met or equaled a listed impairment.   (Id. at 61).   In evaluating Plaintiff's residual functional capacity (RFC), Dr. Horozaniecki concluded that Plaintiff could work at a light exertional level but with the following additional restrictions: Plaintiff should be allowed to sit at least 15 minutes of every hour; rare kneeling or squatting; only occasional overhead reaching; no ladders, scaffolds or unprotected heights; and no exposure to hazardous machinery.   (Id. at 62).

### F.      EVIDENCE FROM THE VOCATIONAL EXPERT

A vocational expert (VE), Kenneth Ogren, also testified at the hearing.   (Id. at 65-71). The ALJ asked Mr. Ogren to consider:  a male person with 16 years of education; limited to light work, lifting not more than 20 pounds occasionally and 10 pounds frequently; who would be on his feet up to six hours in an eight hour day; seated no more than two hours of the day, but with

the sitting spread throughout the day such that the person be able to sit up to 15 minutes of every hour; with rare kneeling and squatting; only occasional overhead reaching; no work on ladders, scaffolds or at unprotected heights; and no work with hazardous machines.  (<u>Id.</u> at 68).   In response to this hypothetical, Mr. Ogren opined that such a person could not return to Plaintiff's past relevant work because "the restrictions specifically of sit every 15 minutes every hour, would essentially make that someone with a sit/stand option and he has not done any work in the past relevant work that has been at the sedentary level."  (<u>Id.</u> at 68-69).  The VE then stated Plaintiff's past skills in computer repair would not be transferable at a sedentary level and would exclude computer repair work.  (<u>Id.</u> at 69, 70). The VE then opined that the plaintiff could perform sedentary work as a sorter, inspector, or polisher.  (<u>Id.</u> at 70).  The ALJ then directed the VE to consider a light exertional job, and in response the VE stated that at a modified light level, Plaintiff's past skills would be transferable.  (<u>Id.</u>).  In response to Plaintiff's attorney, the VE agreed that if the hypothetical person also required a 45-minute nap in the middle of the day, the person would be precluded from employment.  (<u>Id.</u> at 71).

### G.    THE ALJ'S DECISION

The Administrative Law Judge, Roger Thomas, employed the required five-step sequential evaluation in his opinion: (1) whether the claimant had engaged in substantial gainful activity; (2) whether the claimant had a severe impairment; (3) whether the claimant's impairment met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant was capable of returning to past work; and (5) whether the claimant could do other work existing in significant numbers in the regional or national economy.  20 C.F.R. § 404.1520(a)-(f).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the onset date of May 1, 2001. (Admin. R. at 29). At step two, the ALJ found that Plaintiff had severe impairments of: obesity; obstructive sleep apnea; hypothyroidism; degenerative joint disease of the knees and ankles; and chronic fatigue.[10] (Id. at 29-30). The ALJ concluded that Plaintiff did not suffer from a severe mental impairment because medical testing did not reveal evidence of neurological disease, Plaintiff's physicians had not recommended treatment for psychological symptoms, and Plaintiff had not in fact sought treatment for psychological symptoms. (Id. at 30). The ALJ did not evaluate whether Plaintiff's somatoform disorder was a severe impairment. (Id.). At the third step, the ALJ concluded that none of Plaintiff's impairments or combination of impairments met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id. at 31). The ALJ noted that, with respect to the degenerative joint disease, Plaintiff did not have any gross anatomical deformity in his joints or an inability to ambulate effectively. (Id.). The ALJ remarked that, while Plaintiff had previously had right shoulder surgery, Plaintiff had not received any treatment for shoulder complaints since the onset of his disability and the record did not contain evidence that Plaintiff was unable to use his arms effectively. (Id.). With regard to Plaintiff's hypothyroidism, the ALJ noted the condition was controlled with medication. (Id.). Finally, with respect to Plaintiff's sleep apnea, the ALJ first noted that sleep apnea was not a listed impairment, and that Plaintiff's apnea was controlled with medication and use of a CPAP device. (Id.).

Turning to step four, the ALJ found that Plaintiff had the residual functional capacity:

> to lift 20 pounds occasionally and 10 pounds frequently, sit about
> two hours per day, up to 15 minutes per hour, stand and walk up to

---

[10]    The ALJ did not list Plaintiff's right shoulder pain and degenerative disc disease as a severe impairment, but in the substance of his analysis did discuss Plaintiff's shoulder impairment. (Id. at 29-30)

> six hours per day, occasionally reach overhead, rarely kneel or
> squat, and cannot climb ladders or scaffolds, or work heights or
> around hazardous machinery.

(Id.).   In formulating this RFC, the ALJ set out the <u>Polaski</u> factors regarding Plaintiff's credibility.   (Id.).   The ALJ concluded Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."   (Id.).   The ALJ described the objective medical evidence at length and explained his conclusion that the medical evidence did not support the allegedly disabling conditions.   (Id. at 31-32).   The ALJ also asserted that Plaintiff's daily activities were not consistent with his subjective complaints because Plaintiff was able to travel to Hawaii in 2004, during which time he aggravated his ankle pain snorkeling and Plaintiff had recently traveled to the Sturgis motorcycle rally.   (Id. at 32).   The ALJ also discounted Plaintiff's credibility because Plaintiff did not quit his job in 2001 due to his impairments, but rather, was laid off.   (Id.).   Finally, the ALJ noted that the Plaintiff had a sporadic work history, which did not lend credibility to Plaintiff's subjective complaints, and further, Plaintiff's VA disability pension, "gives him little financial incentive to seek work within his restrictions."   (Id.).   The ALJ did not give "significant weight" to the state agency medical consultants regarding the Plaintiff's RFC because those reports did not take into account the medical evidence from 2005 or 2006.   (Id.).   At the fifth step, the ALJ determined that, based on the above RFC, Plaintiff could perform his past relevant work as a computer diagnosis and repair technician.   (Id. at 32-33).

II.     **STANDARD OF REVIEW**

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."  Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992).  "Disability" under the Social Security Act is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  The claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).  The impairment must have lasted or be expected to last for a continuous period of at least twelve months, or be expected to result in death.  Id. § 423(d)(1)(A).

A.      **ADMINISTRATIVE REVIEW**

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.  20 C.F.R. § 404.909(a)(1).  A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.  Id. § 404.929.  If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, although review is not automatic.  Id. §§ 404.967-.982.  The decision of the Appeals Council, or of the ALJ if the request for review is denied, is final and binding upon the claimant unless the matter is appealed to a federal district court within sixty days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. § 404.981.

B.      **JUDICIAL REVIEW**

Judicial review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence in the record as a whole.  Tellez v.

Barnhart, 403 F.3d 953, 956 (8th Cir. 2005); Hutsell v. Sullivan, 892 F.2d 747, 748-49 (8th Cir. 1989).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).  The review is "more than a mere search of the record for evidence supporting the [Commissioner's] finding."  Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).  Rather, "the substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  Id. (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Kirby v. Sullivan, 923 F.2d 1323, 1326 (8th Cir. 1991).

The reviewing court must review the record and consider:

1. The credibility findings made by the ALJ;
2. The plaintiff's vocational factors;
3. The medical evidence from treating and consulting physicians;
4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;
5. Any corroboration by third parties of the plaintiff's impairments; and
6. The testimony of vocational experts when required, which is based upon a proper hypothetical question which sets forth the claimant's impairments.

Johnson v. Chater, 108 F.3d 942, 944 (8th Cir. 1997) (citing Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).  A court may not reverse the Commissioner's decision simply because substantial evidence would support an opposite conclusion.  Tellez, 403 F.3d at 956; Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984).  In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  Instead, the court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).  If it is possible to draw two inconsistent positions from the

evidence and one of those positions represents the Commissioner's decision, the court must affirm that decision.  Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).

**III.    DISCUSSION**

In the instant case, Plaintiff contends that the Commissioner's decision is erroneous because:  (1) the ALJ failed to consider or analyze the VA's finding that Plaintiff was 100% disabled; (2) the ALJ failed to analyze Plaintiff's somatoform disorder; (3) the ALJ was incorrect in rejecting Plaintiff's subjective reports of pain and in determining Plaintiff was not credible; (4) the ALJ failed to give proper weight to the opinions of Plaintiff's treating physicians; and (5) the ALJ did not give full consideration to Plaintiff's apnea after determining apnea is not a listed impairment.  Defendant contests each of Plaintiff's arguments.

This Court finds that:  (1) the ALJ erred by not explicitly addressing the VA's disability determination; (2) the ALJ did not fully develop the record in several respects; (3) the ALJ did not properly assess Plaintiff's credibility; and (4) the ALJ's conclusion that Plaintiff could return to his past work is not supported by substantial evidence in the record.  For these reasons, the Court recommends that the case be remanded back to the Commissioner for further proceedings.

**A.       FAILURE TO CONSIDER THE VA'S 100% DISABILITY RATING**

Plaintiff contends the ALJ erred by failing to consider the VA's disability determination in analyzing Plaintiff's entitlement to disability benefits under the Social Security Act.  Plaintiff asserts, "[t]he Administrative Law Judge did review the VA medical records, but made no comment as to why the VA's decision on disability carried no weight.  There is no way to determine the ALJ's thinking process concerning the issue because he made no reference to the VA [in] his determinations, or the weight given to the VA's determination in his opinion."  (Pl.'s Memo. at 5).  Defendant asserts that the ALJ did take the VA disability determination into

account because the ALJ noted Plaintiff was receiving VA disability benefits and that because of the benefits Plaintiff had little incentive to find work within his restrictions. (Def.'s Memo. in Sup. of Mot. for Summ. J. at 10, hereinafter "Def.'s Memo."). This Court finds that the ALJ's decision fails to meaningfully address the substance of the VA's disability determination and therefore, recommends this case be remanded for further proceedings.

It is well settled that another agency's disability determination, including a Veteran's Affairs determination, is not binding on an ALJ. 20 C.F.R. § 404.1504; Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998). The regulation provides that a "decision by any nongovernmental agency or any other governmental agency about whether you are disabled . . . is based on its rules and is not our decision about whether you are disabled . . . We must make a disability . . . determination based on social security law. Therefore, a determination made by another agency that you are disabled . . . is not binding on us." 20 C.F.R. § 404.1504. Although not binding, a "VA finding [is] important enough to deserve explicit attention" and *must* be considered by the ALJ. Morrison, 146 F.3d at 628 (emphasis supplied) cited in DuBois v. Barnhart, 137 Fed. Appx. 920, 921, 107 Soc. Sec. Rep. Serv. 211 (8th Cir. 2005). Another agency's findings on disability are relevant to the ability to perform work and are entitled to at least *some* weight. Marsh v. Apfel, 23 F. Supp. 2d 1073, 1079 (D. Minn. 1998) (emphasis supplied) (citing Kirby v. Sullivan, 923 F.2d 1323, 1327 (8th Cir. 1991).[11]

---

[11]     What level of weight another agency's disability determination should be afforded is an open question in the Eighth Circuit. Other circuits have reached varying conclusions as to what weight, (great, substantial, etc.), such determinations should be given. See e.g. McCartey v. Massanari, 298 F.3d 1072, 1076 (9th Cir. 2002) ("ALJ must ordinarily give great weight to a VA determination of disability"); Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001) (VA determination entitled to great weight unless ALJ "adequately explain[s] the valid reasons for not doing so."); Falcon v. Heckler, 732 F.2d 827, 831 (11th Cir. 1984) (findings of disability by another agency, although not binding, are entitled to great weight); Kane v. Heckler, 776 F.2d 1130, 1135 (3d Cir. 1985) (VA's disability determination "is entitled to substantial weight."); Hankerson v. Harris, 636 F.2d 893, 897 (2d Cir. 1980) (VA disability determination entitled to

An ALJ "considers" another agency's disability determination where the decision reflects that the ALJ reviewed and took into account the VA disability rating and the medical records upon which the disability rating was based.  See e.g. Lewis v. Barnhart, App. No. 03-1300, 76 Fed. Appx. 756, 757, 2003 WL 22259822, *1 (8th Cir. 2003); Cakora v. Barnhart, App. No. 02-3673, 67 Fed. Appx. 983, 985, 2003 WL 21431184, *1 (8th Cir. 2003).  In Morrison, the government argued that the ALJ had implicitly rejected the VA's disability determination because the ALJ did not discuss the VA's determination.  Morrison, 146 F.3d at 628.  The Eighth Circuit rejected this argument and stated "[i]f the ALJ was going to reject the VA's findings, reasons should have been given, to enable a reasoned review by the courts."  Id.

In this case, other than mentioning that Plaintiff's VA benefits gave him little incentive to work, the ALJ did not mention or discuss the VA's determination that Plaintiff was disabled. Nor did the ALJ reconcile his opinion with that of the VA or explain why he discredited the VA's disability determination.  Likewise, the ALJ's decision does not reflect that he considered the medical records and evidence supporting the VA's decision.  Plaintiff underwent six VA disability compensation examinations:  (1) September 8, 1997, by Dr. Berman related to Plaintiff's physical health; (2) September 8, 1997, by Dr. Westreich related to Plaintiff's mental impairments; (3) February 16, 2000, by Dr. Fifer related to Plaintiff's chronic fatigue syndrome; (4) February 24, 2000, again by Dr. Westreich; (5) March 1, 2000, by Dr. Lundgren related to Plaintiff's mental status; and (6) April 9, 2003, by Dr. Anderson related to Plaintiff's degenerative disc disease.  In his decision, the ALJ did not mention or otherwise refute the VA disability compensation examinations done by Dr. Berman or Dr. Fifer.  While the ALJ did

---

some weight); Allord v. Barnhart, 455 F.3d 818, 820 (7th Cir. 2006) (VA determination entitled to some weight, but declining to follow Ninth Circuit's great weight standard); Grogan v. Barnhart, 399 F.3d 1257, 1262-63 (10th Cir. 2005) (while a VA disability determination is not binding, "it is evidence that the ALJ must consider and explain why he did not find it persuasive."); see also Marsh, 23 F. Supp. 2d at 1079 n. 5.

reference the examinations by Drs. Westreich, Lundgren and Anderson, the ALJ did not explain why he rejected these doctor's opinions that Plaintiff was disabled because of somatization disorder, chronic fatigue and degenerative disc disease. (Admin. R. at 30). The ALJ's decision does not explain why he disagreed with the VA's disability determination or the VA compensation examinations, and the record does not reflect that the ALJ reviewed or considered all the medical records supporting the VA's finding of disability. On this record, this Court cannot conclude that the ALJ gave the VA's determination "explicit attention" as required by the Eighth Circuit in Morrison.

### B.      FAILURE TO DEVELOP THE RECORD

The ALJ's determination of Plaintiff's RFC is not supported by substantial evidence because the ALJ did not fully develop the record in a number of respects. The case should be remanded for further development of the record with respect to: Plaintiff's mental impairment of somatoform disorder; the effects of Plaintiff's obesity on his RFC; and updated medical records reflecting Plaintiff's functional limitations.

### 1.      Somatization Disorder

The VA determined that Plaintiff was 10% disabled from his somatization disorder as of 1995 and 30% as of February 16, 2000, and the examination by Dr. Fifer. Plaintiff contends that the ALJ erred by not analyzing whether Plaintiff suffered from a somatoform disorder and what effect such a disorder would have on Plaintiff's other impairments. We agree with Plaintiff that the ALJ should have more fully developed the record with respect to Plaintiff's mental health and somatization disorder.

The administrative hearing is not an adversarial proceeding. Battles v. Shalala, 36 F.3d 43, 44 (8th Cir. 1994). Therefore, an ALJ is obligated to fully and fairly develop the record,

even in cases such as this where the Plaintiff is represented by counsel.  Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008); Delarosa v. Sullivan, 922 F.2d 480, 485 (8th Cir. 1991); Battles v. Shalala, 36 F.3d 43, 44 (8th Cir. 1994).  The ALJ, however, is not required to investigate a claim not presented at the time of the application for disability benefits and not raised at the hearing. Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003); Peña v. Chater, 76 F.3d 906, 909 (8th Cir. 1996).  There is no bright-line rule to determine when the record has been adequately developed and that determination is made on a case-by-case basis.  Mouser, 545 F.3d at 638; Battles 36 F.3d at 45.

A claimant whose impairment meets or equals the severity of a listed impairment is presumptively disabled and no further inquiry is required.  Brosnahan v. Barnhart, 336 F.3d 671, 676 (8th Cir. 2003).  To meet or equal the listing for somatoform disorders, a claimant must: (A)(1) have medically documented evidence of a history of physical symptoms of several years in duration, beginning before the age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; *or* (A)(2) unrealistic interpretation of physical signs or sensations associated with the preoccupation of belief that one has a serious disease or injury; *and* (B) resulting in at least two of the following:  marked restriction in the activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  20 C.F.R. § 404, Subpt. O, App. 1 § 12.07 (emphasis supplied).

Although not required, the ALJ considered medical records that pre-dated Plaintiff's disability onset.  The ALJ referred to the VA compensation examination in 1997 that indicated Plaintiff suffered from somatization disorder.  (Admin. R. at 30).  However, the ALJ did not

mention or analyze:  Dr. Westreich's affirmation of this diagnosis on February 24, 2000; Dr. Grace's diagnosis of the condition in December 2000 and her GAF; or the VA's conclusion in 2000 and 2003 that Plaintiff's somatization disorder rendered him disabled.  The ALJ's opinion purports to consider whether Plaintiff had a mental impairment that met or equaled a listing. While it is not entirely clear in the ALJ's decision, it appears the ALJ only assessed whether Plaintiff suffered from a mental impairment of affective disorder/depression.  (Id. at 30-31).  The ALJ did not appear to analyze whether Plaintiff's somatization disorder met listing 12.07 or how the disorder affected his RFC.

Defendant asserts that the ALJ did take Plaintiff's somatization disorder into account because the ALJ noted Plaintiff was not taking any psychotropic medication and none of Plaintiff's doctors recommended treatment for psychological symptoms.  (Def.'s Memo. at 11). However, somatoform disorders are not generally treated with prescription medicines or psychotherapy.  See e.g. 4 The Gale Encyclopedia of Medicine, Somatoform Disorders (Donna Olendorft, et. al. 1999) ("In general . . . it is considered better practice to avoid prescribing medications for these patients . . . Patients with somatoform disorders are not considered good candidates for psychoanalysis and other forms of insight-orientated therapy.  They can benefit, however, from supportive approaches to treatment that are aimed at symptom reduction."). Further, Plaintiff's treating physician, Dr. Grace, did in fact recommend treatment for Plaintiff's somatoform disorder and pain in the form of relaxation and self-hypnosis classes.  These facts should have put the ALJ on notice to analyze and develop the record with respect to Plaintiff's somatization disorder.  Further, although the ALJ mentioned these facts in his mental capacity analysis, it does not appear that in mentioning these facts the ALJ was analyzing Plaintiff's somatization disorder, only an affective disorder or depression.

Although it is a close issue, we believe the medical records diagnosing Plaintiff with somatization disorder coupled with the VA's determination that Plaintiff was 30% disabled by the disorder, are sufficient to put the ALJ on notice that Plaintiff's somatization disorder and resulting mental functional capacity, were at issue.   It is clear in the record that Plaintiff is claiming his degenerative joint disease is one basis for his disability claim.   Because Plaintiff's somatization disorder and complaints of pain are interrelated to his joint impairments, the case should be remanded for further development on the issue of the functional limitations from Plaintiff's somatization disorder and the combined effect of Plaintiff's somatization disorder with his other impairments.

## 2.      Obesity

Although the ALJ found that Plaintiff's obesity was a severe impairment, the Court concludes this case should be remanded because the ALJ failed to comply with SSR 02-01p by not considering the impact of Plaintiff's obesity on his RFC.

Obesity is no longer a listed impairment.   However an ALJ still must give consideration to a Plaintiff's obesity.   Daniel v. Barnhart, 01-CV-852, 2002 WL 31045847, *3 (D. Minn. Sept. 10, 2002).   In 1999, when the Social Security Commission deleted obesity as a separate listing, it did not eliminate obesity as a factor in the disability analysis.   Id.   The regulations now provide that obesity should be considered in determining whether a claimant meets the musculoskeletal, respiratory, or cardiovascular listings.   The prefatory language to the musculoskeletal listings provides:

> Obesity is a medically determinable impairment that is often
> associated with disturbance of the musculoskeletal system, and
> disturbance of this system can be a major cause of disability in
> individuals with obesity. The combined effects of obesity with
> musculoskeletal impairments can be greater than the effects of
> each of the impairments considered separately. Therefore, when

> determining whether an individual with obesity has a listing-level
> impairment or combination of impairments, and when assessing a
> claim at other steps of the sequential evaluation process, including
> when assessing an individual's residual functional capacity,
> adjudicators must consider any additional and cumulative effects
> of obesity.

20 C.F.R. § 404, subpt. P, App. 1 § 1.00(Q).

The ALJ determined at step two that Plaintiff's obesity was a severe impairment.  The ALJ did not otherwise discuss or analyze Plaintiff's obesity or its effects on his other impairments at steps three and four.  While a deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding when the deficiency has no practical effect on the outcome of the case, Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999), in this case the Court cannot determine if the ALJ followed SSR 02-01p.  Given that the Court recommends remanding this case for further development of the record in other areas, on remand the ALJ should also give explicit consideration to the combined effects of Plaintiff's obesity and other impairments.

### 3.      Updated Medical Records

Plaintiff also asserts that the ALJ failed to consider the entire record and improperly relied on the opinion of the medical expert instead of using the opinions and limitations articulated by Plaintiff's treating physicians and Dr. Phibbs, the state-agency consulting doctor.  (Plaintiff's Memo. at 10-11).  The Court agrees that the ALJ's determination of Plaintiff's RFC is not supported by substantial evidence because it is based solely on the testimony of non-examining providers.  This case should be remanded for further development of the medical evidence regarding Plaintiff's RFC.

In evaluating a medical opinion, an ALJ must consider the following factors:  (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the

record as a whole; and (5) whether the treating physician is also a specialist.   20 C.F.R. § 404.1527(d).   The same factors apply to the opinions of a testifying medical expert.   Id. § 404.1527(f)(2)(iii).   A treating physician's opinion is typically entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory and diagnostic techniques and is not inconsistent with other substantial evidence in [the] record."   Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)).   The ALJ may credit other medical opinions over that of a treating physician when such opinions are supported by better evidence or where the treating physician has rendered inconsistent opinions.   Id. at 1013.

An ALJ is not permitted to offer a medical opinion regarding a claimant's functional capacities.   Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004).   When the evidence from a treating physician or other medical source is inadequate to determine if the claimant is disabled, the Commissioner should contact the medical source for additional information.   20 C.F.R. § 404.1512.   An ALJ is not required to obtain additional medical evidence if the other evidence in the record provides a sufficient basis for the ALJ's decision.   Warburton v. Apfel, 188 F.3d 1047, 1051 (8th Cir. 1999).   In cases where there is insufficient medical evidence, the case should be remanded for further development of the record.   Bowman v. Barnhart, 310 F.3d 1080, 1085 (8th Cir. 2002).   Generally, the opinion of a consulting physician who examines a claimant once is not substantial evidence.   Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998); Bowman, 310 F.3d at 1085.   An ALJ cannot assess a claimant's RFC by relying only on the opinions of non-treating physicians because such opinions do not meet the substantial evidence standard.   Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000) (remanding case because no treating physicians opined on claimants ability to function in the workplace and ALJ relied only on non-treating physicians to form opinion of plaintiff's RFC).

In this case, the ALJ does not rely on any medical evidence from a treating physician regarding Plaintiff's physical functional capacity.  There is a functional capacity assessment by a treating physician for Plaintiff's mental health, but that assessment was completed in December 2000, almost six years before the administrative hearing.  In addition to being the opinions of a consulting physician, the latest report from the state agency physician conflicted with the testimony of the ME.  The ME concluded that the plaintiff could perform modified light work, which generally includes an ability to stand for six hours in an eight hour day.  (Admin. R. 62). In June 2004, Dr. Phibbs concluded that Plaintiff could only stand for two hours in an eight hour day.  (Id. 300).[12]  The ALJ chose to rely on the ME's testimony and gave less weight to Dr. Phibbs' opinion because he did "not take into account any of the medical evidence from 2005 or 2006."  (Id. at 32).  The ALJ does not however, explain why the ME concluded Plaintiff could stand for longer than two hours and there is no evidence of Plaintiff's impairments improving in 2005 or 2006.  Moreover, Dr. Phibbs' opinion that Plaintiff was more limited in his functional capacity, did not include the updated September 21, 2004 medical records and x-rays when Plaintiff was examined by orthopedic specialists.  (Id. at 528-29, 589-594).  The ALJ should have obtained updated reports from the state agency physicians and obtained information from Plaintiff's treating physicians regarding his residual functional capacity.  The case should be remanded for further development of the record.

---

[12]     Plaintiff contends that Dr. Phibbs opined that the Plaintiff could perform work at a level less than sedentary.  (Plaintiff's Memo. at 11).  As the ALJ pointed out at the hearing, the document Plaintiff refers to for this proposition is a Medical Consultant Review Request, the form which the Social Security Administration uses to obtain a consulting opinion.  (Admin. R. at 307).  This Medical Consultant Review Request notation sought an opinion from Dr. Phibbs regarding whether Plaintiff could work at a sedentary or less than sedentary level.  That document is not Dr. Phibbs opinion, rather as noted in the Medical Consultant Review Request, his opinion is on form SSA-4734.  (Admin. R. 299-306).

### C.     THE ALJ'S ASSESSMENT OF PLAINTIFF'S CREDIBILITY

Plaintiff contends that the ALJ erred in his credibility assessment of Plaintiff by: (1) rejecting Plaintiff's testimony that his apnea caused him daytime fatigue and required him to lie down for a period of 20-45 minutes every day; and (2) rejecting Plaintiff's subjective complaints of pain. Defendant maintains that the ALJ properly assessed Plaintiff's credibility and rejected Plaintiff's claim that he needed to lie down during the workday. Because this Court concludes the ALJ failed to develop the record with respect to Plaintiff's somatoform disorder, the ALJ could not properly evaluate Plaintiff's credibility.

In the Eighth Circuit, credibility determinations are governed by factors enunciated in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). In assessing subjective complaints, an ALJ must examine several factors: "(1) the claimant's daily activities; (2) the duration, frequency[,] and intensity of pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (citing Polaski, 739 F.2d at 1322). Other relevant factors are the claimant's work history and the objective medical evidence. Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999) (citing Polaski, 739 F.2d at 1322). "While these considerations must be taken into account, the ALJ's decision need not include a discussion of how every Polaski factor relates to the claimant's credibility." Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007) (citing Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004)). An ALJ may discount subjective complaints if they are inconsistent with the evidence as a whole. Id. (citing Polaski, 739 F.2d at 1322). Where an ALJ seriously considers, but for good reasons explicitly discredits a plaintiff's subjective complaints, the court will not disturb the ALJ's credibility determination. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

The Social Security Act requires an ALJ to consider the combined effect of all the claimant's impairments, without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling. 20 C.F.R. § 404.1523; Cunningham v. Apfel, 222 F.3d 496, 501 (8th Cir. 2000) (citing Delarosa v. Sullivan, 922 F.2d 480, 484 (8th Cir. 1991)). The ALJ also must consider the combined effects of a claimant's physical and mental impairments. Cunningham, 222 F.3d at 501. When a social security claimant suffers from a somatoform disorder, the ALJ must consider the effects of that disorder in assessing the claimant's credibility and subjective complaints of pain. Benson v. Heckler, 780 F.2d 16, 18 (8th Cir. 1985) (citing Reinhart v. Sec'y of Health & Human Services, 733 F.2d 571, 573 (8th Cir. 1984)). In cases where the claimant has a somatoform disorder, the ALJ cannot reject the Plaintiff's subjective complaints of pain merely because the complaints are not supported by medical evidence, specifically because the disorder "causes [a claimant] to exaggerate [his or] her physical problems in [his or] her mind beyond what the medical data indicate." Easter v. Bowen, 867 F.2d 1128, 1130 (8th Cir. 1989). When a claimant has a somatoform disorder, the ALJ is not free to simply reject the claimant's subjective complaints "particularly since [he or] she has a diagnosed mental disorder that causes a distorted perception of her physical ailments. To do so is directly contrary to the spirit of Polaski v Heckler." Easter, 867 F.2d at 1131. An ALJ may nevertheless disbelieve the subjective complaints of pain of a claimant suffering from a somatoform disorder, if the ALJ explicitly considers the somatoform disorder and makes express findings regarding why the claimant's testimony is not credible. Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995).

This case should be remanded for the ALJ to re-consider the Plaintiff's credibility and subjective complaints of pain. The ALJ was correct that it is relevant to Plaintiff's credibility

that he did not quit his job because of his impairments but instead ceased work because of other reasons. <u>Goff v. Barnhart</u>, 421 F.3d 785, 793 (8th Cir. 2005). It is also true that a lack of strong pain medication is inconsistent with complaints of disabling pain. <u>Haynes v. Shalala</u>, 26 F.3d 812, 814 (8th Cir. 1994). However, in this case Plaintiff indicated he did not wish to take strong pain medication because of the possible side effects on his kidneys. (Admin. R. at 653). Instead, Plaintiff used other methods to treat his pain, including chiropractor visits, use of relaxation techniques, and self-hypnosis. (<u>Id.</u> at 716-17). At times Plaintiff did take prescription pain medication for his ankle pain and sprains and the records reflect he took between six and twenty aspirin per day. (<u>Id.</u> at 280, 282, 334-35, 614) Plaintiff frequently sought medical treatment for his conditions, and the medical records substantiate Plaintiff's degenerative joint disease and limited range of motion. (<u>See e.g. id.</u> 592-93). While the ALJ considered the <u>Polaski</u> factors in his analysis of Plaintiff's subjective complaints, the analysis did not take into consideration whether Plaintiff suffered from a somatoform disorder, how severe the disorder was, or how such a somatoform disorder affected Plaintiff's subjective complaints of joint pain in terms of his pain severity and intensity. Plaintiff's somatization disorder could have impacted Plaintiff's perception of his joint pain and therefore this case should be remanded and the ALJ should consider Plaintiff's somatization disorder in the <u>Polaski</u> analysis of Plaintiff's subjective complaints.

## D.     EVIDENCE SUPPORTING PLAINTIFF'S ABILITY TO RETURN TO HIS PAST WORK

The Court also notes that, even if the ALJ's determination of Plaintiff's RFC was supported by substantial evidence, the ALJ's conclusion that Plaintiff could perform his past relevant work with such an RFC is not supported by substantial evidence.

The ALJ's first hypothetical included the limitation that the Plaintiff be able to sit up to 15 minutes each hour. (Admin. R. 68). In response to this hypothetical, the VE testified that such a hypothetical person could not perform the jobs in the VE's report and could not perform Plaintiff's past work in computer repair. (Id. at 68-69). The ALJ included the 15 minute sitting requirement in Plaintiff's RFC but incorrectly disregarded the VE's testimony that with such a restriction the Plaintiff could not perform his past work. Since the VE's testimony is the only vocational evidence, the ALJ's conclusion Plaintiff could perform his past relevant work is not supported by substantial evidence.

### E.     FAILURE TO ANALYZE PLAINTIFF'S SLEEP APNEA

Plaintiff also contends that the ALJ did not consider the effect of Plaintiff's apnea on his RFC. (Plaintiff's Memo. at 6). Notwithstanding the remand on the issues set forth *supra.*, the Court has evaluated Plaintiff's objection regarding his apnea and finds that the ALJ's determination on this issue is supported by substantial evidence in the record.

At step three of the evaluation process for determining whether an individual is disabled, the ALJ correctly noted that sleep apnea is not a listed impairment. (Admin. R. at 31). At the fourth step, the ALJ discussed Plaintiff's sleep apnea and concluded that his hypersomnolence and apnea were under control because of his thyroid replacement medicine, Ritalin, and CPAP machine. (Id.). In assessing the Plaintiff's RFC, the ALJ asked the VE to include sleep apnea in his hypothetical. (Id. at 61 and 68). The record reflects the ALJ did not stop at step three in the evaluation process of Plaintiff's sleep apnea. The ALJ went on to consider Plaintiff's RFC and in doing so took Plaintiff's apnea into consideration. Furthermore, the VA did not base its disability determination on Plaintiff's apnea. (Id. at 125). The record reflects the ALJ did in fact

CASE 0:08-cv-05911-AJB   Document 15   Filed 03/18/09   Page 43 of 43

consider Plaintiff's apnea at step four of the evaluation process and therefore the ALJ did not err in his analysis of Plaintiff's apnea.

## IV.    RECOMMENDATION

Although it is not entirely clear from Plaintiff's Memorandum, the Court believes Plaintiff is requesting a reversal of the Commissioner's decision with an outright award of benefits.  The Court concludes that an outright benefit award is not appropriate in this case. Instead, this case should be remanded for further development of the record.

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment [Docket No. 8] be **GRANTED as to remand**;

2.      Defendant's Motion for Summary Judgment [Docket No. 12] be **DENIED**; and

3.      The case be **REMANDED** to the Commissioner for further proceedings consistent with this Report and Recommendation.


Dated:  March 18, 2009

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **April 2, 2009**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.